[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-11768

_____

MICHELLE AREVALO,

Plaintiff-Appellant,

*versus*

MENTOR WORLDWIDE LLC, et al.,

Defendant,

COLOPLAST CORP,

Defendant-Appellee.

———————————

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 3:19-cv-03577-TKW-MJF

———————————

Before LUCK, BRASHER, and ED CARNES, Circuit Judges.

PER CURIAM:

In 2010 Michelle Arevalo was surgically implanted with two of Coloplast Corp.'s pelvic mesh products: the Aris Transobturator Sling System and the Exair Prolapse Repair System. She suffered pain and complications after the surgeries and sued Coloplast under theories of strict liability and negligence.

The district court granted Coloplast's *Daubert* motion to exclude as unreliable the specific causation opinion of Dr. Bruce Rosenzweig, Arevalo's retained specific causation expert. It later struck her belated disclosure of Dr. John Miklos as a non-retained specific causation expert. The court then granted Coloplast summary judgment because Arevalo did not have admissible expert testimony on specific causation. This is Arevalo's appeal.

## I.  BACKGROUND

Arevalo's pelvic area issues began in childhood when she started having bladder and urinary tract infections (UTIs).[1]  Later she developed pelvic pain, heavy and painful periods, and pain during intercourse.  Her three pregnancies each resulted in vaginal deliveries, some with complications.  During her first delivery in 1994, she suffered a torn sphincter and had an episiotomy.  Her second and third deliveries (1997 and 2001) were both precipitous (unusually fast).  In 1995 she had a loop electrosurgical excision procedure (LEEP) to remove abnormal tissue from her cervix, and in 2002 she had her tubes tied.

In 2010 Arevalo sought treatment from gynecologist Dr. Glenn Bankert for her heavy and painful periods, pain during intercourse, and occasional urine leakage.  Dr. Bankert diagnosed her with menorrhagia (heavy or prolonged periods), dysmenorrhea (painful periods), pelvic pain, and stress urinary incontinence.  He also gave her a pelvic exam and found that she had an enlarged uterus, a second-degree uterine prolapse, and a first-degree cystocele.[2]  In September 2010 he performed a total vaginal hysterectomy to remove Arevalo's uterus and cervix.  At the same time, he

---

[1] At this stage "we are required to view the evidence and all factual inferences therefrom in the light most favorable to [Arevalo], and resolve all reasonable doubts about the facts in [her] favor."  *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013) (quotation marks omitted).

[2] A uterine prolapse occurs when the uterus drops down into the vaginal canal. A cystocele occurs when the bladder drops down into the vaginal canal.

4                        Opinion of the Court                        21-11768

implanted her with Coloplast's Aris mesh to treat her stress urinary incontinence.

Less than two months later Dr. Bankert diagnosed Arevalo with significant pelvic organ prolapse. Her first-degree cystocele had progressed to second-degree, meaning that her bladder had fallen about halfway down her vaginal canal. She also had a second- to third-degree rectocele.[3] That December Dr. Bankert performed a second pelvic reconstructive surgery, this time to repair her prolapsing organs. To strengthen her front and back vaginal walls, he implanted them with Coloplast's Exair mesh. He thought both surgeries were successful.

Three and a half years later, Arevalo saw gynecologist Dr. Marjorie Kahn for help with persisting pelvic area issues. Arevalo complained of incomplete bladder emptying, vaginal bulging, urinary frequency, occasional urine leakage, UTIs, uncomfortable urination, fecal incontinence, and pain during intercourse. During Dr. Kahn's pelvic exam of Arevalo, she could feel the Exair mesh in Arevalo's front vaginal wall. When Dr. Kahn touched the mesh, Arevalo felt tenderness. Dr. Kahn ultimately diagnosed Arevalo with a litany of conditions, including organ prolapse, scar pain, and mesh implant complications. For treatment she recommended physical therapy and trigger point injections in the tender areas to break up any scar tissue. Arevalo reported some improvement after the injections but still felt pain during intercourse. Believing it

---

[3] A rectocele occurs when the rectum protrudes through the back vaginal wall.

would help relieve the pain and tenderness, Dr. Kahn proposed re-moving some of the mesh.

In February 2014 Dr. Kahn performed a graft removal sur-gery during which she removed most of the Exair mesh from Are-valo's front vaginal wall.[4] She also repaired and strengthened Are-valo's front vaginal wall and repaired her sphincter.  Dr. Kahn noted that Arevalo's vaginal tissue was more pliable after surgery, which she hoped would lessen the pain.  But Arevalo continues to have pelvic pain, pain during intercourse, and stress urinary incon-tinence.

## II.  PROCEDURAL HISTORY

In February 2013 Arevalo filed a short form complaint against Coloplast and other entities in a multidistrict litigation pro-ceeding in the Southern District of West Virginia.  *In re: Coloplast Corp., Pelvic Support Sys. Prods. Liab. Litig.*, No. 2:12-md-2387 (S.D. W. Va. 2012).  Her short form complaint adopted sixteen counts from the MDL master complaint, but she ultimately pur-sued only the following claims: negligent design and failure to warn, strict liability design defect, strict liability failure to warn, and gross negligence.  She also sought punitive damages.

In September 2019 Arevalo's case was transferred to the Northern District of Florida, and the transfer order stated that the

---

[4] Dr. Kahn testified that she never felt or located the Exair mesh in Arevalo's back vaginal wall.

case was ready to be set for trial.  At the time of transfer, Coloplast had two outstanding motions.  One was a motion for partial summary judgment on Arevalo's uncontested claims.[5]  The other was a *Daubert* motion to exclude or limit opinions offered by Dr. Bruce Rosenzweig, one of Arevalo's general causation experts and her only retained specific causation expert.  The parties had also filed other *Daubert* motions in the MDL action that had been denied without prejudice, giving them the option to refile those motions in the transfer court.  Upon transfer, the parties told the district court that they intended to renew these motions, and Coloplast asked for the chance to re-brief them under our circuit's law.  Arevalo opposed any re-briefing.

The district court held a case management conference, concluded that the case was not ready for trial, and allowed the parties to re-brief their *Daubert* motions.  Arevalo re-filed four *Daubert* motions and Coloplast re-filed five.  One of Coloplast's re-briefed motions sought to exclude or limit Dr. Rosenzweig's opinions.  Coloplast argued that Dr. Rosenzweig's specific causation opinion was unreliable because his differential diagnosis methodology —

---

[5] Coloplast moved for partial summary judgment on Arevalo's claims for negligent manufacturing, strict liability manufacturing defect, strict liability defective product, breach of express warranty, breach of implied warranty, constructive fraud, "discovery rule, tolling, and fraudulent concealment," negligent infliction of emotional distress, violation of consumer protection laws, and unjust enrichment.  Arevalo conceded that Coloplast was entitled to summary judgment on these claims, and the district court granted Coloplast's motion.

the scientific process of identifying and ruling out other possible causes of an injury — was deficient. The district court granted all nine *Daubert* motions in part. Relevant to this appeal, it excluded as unreliable Dr. Rosenzweig's specific causation opinion.

Coloplast promptly moved for summary judgment on the grounds that Arevalo lacked competent specific causation evidence. Seeing the writing on the wall, Arevalo moved for reconsideration of parts of the district court's order excluding Dr. Rosenzweig's opinions and for the first time asked for an evidentiary hearing. The district court denied the motion.

Arevalo made one last attempt to salvage her case. On July 27, 2020, less than three weeks after the district court excluded Dr. Rosenzweig's specific causation opinion, she had her first and only appointment with Dr. John Miklos (who had served as a retained expert in other pelvic mesh cases). On January 26, 2021 — nearly three months after Coloplast's motion for summary judgment was fully briefed and with trial less than two months away[6] — Arevalo filed a supplemental Rule 26 expert witness disclosure naming Dr. Miklos as a non-retained expert witness and treating physician. She attached a case report Dr. Miklos prepared in which he opined that based on a "differential diagnosis" process, the mesh implants are the sole cause of her pain. Coloplast moved to strike the disclosure under Federal Rule of Civil Procedure 37(c) as untimely. The

[6] In February 2021, the parties agreed to continue trial to November 2021 for reasons related to the COVID-19 pandemic.

district court agreed that the disclosure was untimely and excluded Dr. Miklos' testimony.

Having resolved the expert witness issues, the district court turned to Coloplast's motion for summary judgment.  It granted Coloplast summary judgment on all remaining claims, finding that Arevalo lacked sufficient proof of specific causation without Dr. Rosenzweig's excluded testimony.  Arevalo timely appealed the final judgment, listing in her notice of appeal the *Daubert* order excluding Dr. Rosenzweig's opinions, the order excluding Dr. Miklos' testimony, and the order granting summary judgment.

## III.  DISCUSSION

### A.  Dr. Rosenzweig

We begin with the question of whether the district court properly excluded Dr. Rosenzweig's specific causation opinion that Coloplast's mesh implants caused Arevalo's pain.  We review for abuse of discretion a district court's *Daubert* rulings. *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1305 (11th Cir. 2014).  A district court has abused its discretion if it "applied an incorrect legal standard, followed improper procedures, or made clearly erroneous findings of fact." *Crawford v. ITW Food Equip. Grp., LLC*, 977 F.3d 1331, 1338 (11th Cir. 2020).  We must apply this standard "stringently, even if a decision on expert testimony is outcome determinative." *Chapman*, 766 F.3d at 1305 (quotation marks omitted).

"[W]e engage in a rigorous three-part inquiry" to determine the admissibility of expert testimony under Federal Rule of Evidence 702: (1) the expert must be qualified, (2) his methodology must be sufficiently reliable as determined by the sort of inquiry mandated by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and (3) his testimony must assist the trier of fact. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc). This appeal concerns the second prong — the reliability of Dr. Rosenzweig's differential diagnosis methodology.

To evaluate the reliability of a scientific expert opinion, the district court assesses "whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 1261–62 (alteration adopted and quotation marks omitted). There can't be too great an analytical gap between the data and the expert's opinion, and the expert cannot bridge this gap with mere *ipse dixit*. *Guinn v. AstraZeneca Pharms. LP*, 602 F.3d 1245, 1255–56 (11th Cir. 2010). As the proponent of Dr. Rosenzweig's expert opinion, Arevalo has the burden of establishing its reliability. *Frazier*, 387 F.3d at 1260.

Dr. Rosenzweig intended to offer the opinion that within a reasonable degree of medical certainty, the Aris and Exair mesh implants directly caused Arevalo's pelvic pain, vaginal pain, pain during intercourse, frequent UTIs, urinary and fecal incontinence, and mesh removal procedure. In his case-specific expert report, Dr.

Rosenzweig explained that he arrived at this specific causation opinion by employing a differential diagnosis methodology.

The differential diagnosis methodology is "a medical process of elimination whereby the possible causes of a condition are considered and ruled out one-by-one, leaving only one cause remaining." *Chapman*, 766 F.3d at 1308 (quotation marks omitted). It requires three steps: "(1) the patient's condition is diagnosed, (2) all potential causes of the ailment are considered, and (3) differential etiology is determined by systematically eliminating the possible causes." *Id.* To be reliable, a differential analysis "need not rule out all possible alternative causes" but "must at least consider other factors that could have been the sole cause of the plaintiff's injury." *Id.* at 1308–09 (quotation marks omitted).

If properly followed, differential diagnosis can be a reliable methodology under *Daubert*. *Id.* at 1309. But "an expert does not establish the reliability of his techniques or the validity of his conclusions simply by claiming that he performed a differential diagnosis on a patient." *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1253 (11th Cir. 2005). "[A] differential diagnosis that fails to take serious account of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion on causation." *Guinn*, 602 F.3d at 1253 (quotation marks omitted).

Dr. Rosenzweig's expert report stated that he had used a differential diagnosis methodology, but it was short on details. The entirety of his report about that methodology was this:

> Based upon my medical education, experience, my review of the currently available medical literature, and [Arevalo's] medical records, I have formed opinions regarding her current complications. In coming to these conclusions, a broad differential diagnosis was reviewed and considered her medical and surgical history, which includes: she was a G3 P3. Her medical history includes: Kidney stones, Asthma, Bipolar disorder, Headaches, rectocele, cystocele, uterine prolapse, Human papilloma virus and dysplasia of uterine cervix. Her surgical history was remarkable for T.L. and LEEP procedure. None of these conditions lead to the current injuries she is suffering from. I ruled out the hysterectomy as there are no findings of tenderness at the vaginal cuff.

### 1.  The District Court's *Daubert* Order

Coloplast moved to exclude as unreliable Dr. Rosenzweig's specific causation opinion, arguing that he did not perform an adequate differential diagnosis methodology because he failed to provide a medically sound basis for how he ruled out aspects of Arevalo's medical history as possible alternative causes. Coloplast attached to its motion Dr. Rosenzweig's case-specific expert report and a few pages of his case-specific deposition transcript. Arevalo responded that Dr. Rosenzweig reviewed her medical records and properly ruled out other potential causes, but she did not attach or even refer to any part of Dr. Rosenzweig's deposition testimony. Instead she relied exclusively on his expert report.

The district court granted Coloplast's motion, finding that Dr. Rosenzweig did "not explain how he systematically and scientifically ruled out the other potential causes" for Arevalo's condition, "such as her rectocele, cystocele, or uterine prolapse." Without more information about how he had ruled out potential alternative causes, the court could not ensure that he had made a reliable differential diagnosis. In excluding Dr. Rosenzweig's differential diagnosis methodology, the district court excluded his entire specific causation opinion.

The district court did not abuse its discretion when it excluded Dr. Rosenzweig's specific causation opinion. In his cursory report, Dr. Rosenzweig offered no explanation — let alone any scientific support — for ruling out the potential alternative causes that he had identified (other than the hysterectomy). A reliable differential diagnosis requires the expert to offer *some* explanation for how he ruled out an alternative cause. *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1197 (11th Cir. 2010); *see also Chapman*, 766 F.3d at 1310 ("The expert must provide reasons for rejecting alternative hypotheses using scientific methods and procedures and the elimination of those hypotheses must be founded on more than subjective beliefs or unsupported speculation.") (quotation marks omitted). Dr. Rosenzweig's assurances that he had done a differential diagnosis are not enough to establish the reliability of his methodology. *McClain*, 401 F.3d at 1253.

Arevalo argues that the district court should not have faulted Dr. Rosenzweig for failing to explain why he ruled out Arevalo's

21-11768                Opinion of the Court                13

rectocele, cystocele, and uterine prolapse.  According to Arevalo, there was no need to rule out those potential causes because the Exair mesh fixed her rectocele and cystocele, and it was impossible for her to still have uterine prolapse because she no longer had a uterus.  Arevalo's argument is wrong on the facts about the cystocele; the record shows that during the mesh removal procedure, Dr. Kahn found that Arevalo had another cystocele.  And, in any event, it is not Arevalo's post hoc explanations that matter to the reliability analysis.  The district court's criticism of Dr. Rosenzweig for omitting an explanation for ruling out those three potential causes is valid.[7] *See, e.g.*, *Hendrix*, 609 F.3d at 1197; *Chapman*, 766 F.3d at 1310.

---

[7] Citing the law of the case doctrine, Arevalo also suggests that the district court reversed the MDL court's transfer order when it allowed Coloplast to challenge the differential diagnosis methodology in its re-briefed *Daubert* motion even though it had not done so in its MDL briefing.  Arevalo's law of the case argument fails because the district court did not reverse the MDL transfer order.  Indeed, the MDL order itself acknowledged that the parties had filed dispositive and *Daubert* motions that were to be resolved by the transferee court.

"District courts have unquestionable authority to control their own dockets," which includes "broad discretion in deciding how best to manage the cases before them." *Smith v. Psychiatric Sols., Inc.*, 750 F.3d 1253, 1262 (11th Cir. 2014) (quotation marks omitted).  The district court in this case ordered re-briefing on the *Daubert* motion because it decided that was the best way to make the correct ruling on that motion.  The district court did not abuse its discretion in doing so.

2.  The District Court's Denial of Reconsideration

Arevalo next contends that the district court erred when it refused to reconsider its order excluding Dr. Rosenzweig's specific causation opinion.  We review a district court's decision about whether to reconsider its own interlocutory order only for abuse of discretion.  *See Harper v. Lawrence County*, 592 F.3d 1227, 1231–32 (11th Cir. 2010); *Region 8 Forest Serv. Timber Purchasers Council v. Alcock*, 993 F.2d 800, 805–06 (11th Cir. 1993).

It wasn't until Arevalo moved for reconsideration that she gave the court the complete transcript of Dr. Rosenzweig's deposition and pointed out the specific testimony relevant to his differential diagnosis.  This oversight occurred even though, according to Arevalo, Dr. Rosenzweig's differential diagnosis methodology was fleshed out in his deposition testimony.[8]  Citing the legal standard for reconsideration of a final judgment, Arevalo argued that it would be manifestly unjust for the district court to decline to reconsider its *Daubert* order in light of the full deposition testimony.

The district court denied reconsideration.  It agreed with Arevalo that the only grounds for granting reconsideration are newly discovered evidence or manifest errors of law or fact.  *See,*

---

[8] Arevalo never explained to the district court why she failed to provide or reference the deposition testimony when she first opposed the *Daubert* motion to exclude Dr. Rosenzweig's differential diagnosis methodology.  The testimony was available for nearly a year before she filed her response in opposition to Coloplast's *Daubert* motion.  She now concedes that attaching the complete deposition transcript to her response "might've been best practice."

*e.g.*, *Samara v. Taylor*, 38 F.4th 141, 149 (11th Cir. 2022) (reviewing the denial of a motion for reconsideration under Federal Rule of Civil Procedure 59(e)).  For this reason, it explained, a party cannot use a motion for reconsideration "to relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment."  *Id.* (quotation marks omitted).  It then found that Arevalo had not met this high bar for reconsideration: she either rehashed old arguments or presented evidence (the deposition testimony) that was available while the *Daubert* motion was pending.

Arevalo argues that the district court abused its discretion by applying the standard for reconsideration of final judgments under Rules 59(e) or 60(b).[9]  She asserts the court should have used its inherent power under Rule 54(b) to reconsider its own interlocutory order.  *See* Fed. R. Civ. P. 54(b) ("[A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of a [final] judgment."); *Toole v. Baxter Healthcare Corp.*, 235 F.3d 1307, 1315 (11th Cir. 2000) ("Since an order granting a new trial is an interlocutory order, the district court has plenary power over it and this power to

---

[9] "A motion for reconsideration made after final judgment falls within the ambit of either Rule 59(e) (motion to alter or amend a judgment) or Rule 60(b) (motion for relief from judgment or order)."  *Region 8 Forest Serv. Timber Purchasers Council*, 993 F.2d at 806 n.5.

16                    Opinion of the Court                    21-11768

reconsider, revise, alter or amend the interlocutory order is not subject to the limitations of Rule 59.") (quotation marks omitted).

If the district court erred by applying the wrong standard, the error was invited.[10]  Arevalo urged the district court to apply the legal standard for reconsideration under Rule 59(e).  She can't now complain that the district court applied the standard she requested.  *See EEOC v. Mike Smith Pontiac GMC, Inc.*, 896 F.2d 524, 528 (11th Cir. 1990) (declining to reverse the district court's decision where the appellant had invited error as to the application of the wrong legal standard); *FTC v. AbbVie Prods. LLC*, 713 F.3d 54, 65–66 (11th Cir. 2013).[11]

---

[10] Though Coloplast did not argue that Arevalo invited error, we apply the doctrine anyway.  *See United States v. Brown*, 934 F.3d 1278, 1301 (11th Cir. 2019).

[11] Arevalo briefly asserts that even under Rule 59(e)'s reconsideration standard, the district court clearly erred because Dr. Rosenzweig's full deposition established that the court initially misunderstood Arevalo's medical history, including the significance of her rectocele, cystocele, and uterine prolapse.  But motions for reconsideration may not be used to present testimony that could have been introduced earlier.  *See, e.g.*, *Grange Mut. Cas. Co. v. Slaughter*, 958 F.3d 1050, 1059–60 (11th Cir. 2020).  Denial of a Rule 59(e) motion for reconsideration "is especially soundly exercised" when, as here, "a party gives no reason for not previously raising an issue." *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 957 (11th Cir. 2009) (quotation marks omitted).  And as discussed, the district court did not err, much less clearly err, by finding that Dr. Rosenzweig's expert report failed to explain how he ruled out Arevalo's rectocele, cystocele, or uterine prolapse.  So under the standard the district court applied, it did not abuse its discretion in denying reconsideration.

### B.  Dr. Miklos

Arevalo next challenges the district court's decision to strike her belated disclosure of Dr. Miklos.  Federal Rule of Civil Procedure 26(a)(2)(D) requires a party to disclose the identities of her expert witnesses at the time and in the sequence the court orders.  Rule 26(e)(1)(A) requires a party to supplement these disclosures "in a timely manner" if she later learns that in some material respect they are incomplete or incorrect.  If a party violates those disclosure requirements, Rule 37 sanctions may be applied.  *See* Fed. R. Civ. P. 37(c)(1).  One of those sanctions is that "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial," unless the failure to disclose "was substantially justified or is harmless."  *Id.*  The court may also impose "other appropriate sanctions."  Fed. R. Civ. P. 37(c)(1)(C).

The district court found that Arevalo had violated Rule 26.  Her disclosure came more than three years after the court's deadline for disclosing specific causation experts, and even if it could be considered a supplemental disclosure under Rule 26(e) it was not made "in a timely manner."  At Arevalo's appointment with Dr. Miklos in July 2020, the doctor told her that the mesh implants were the cause of her pelvic pain.  So Arevalo could have and should have disclosed him as an expert witness in July 2020 instead of six months later at the end of January 2021.  The court found that the late disclosure was neither substantially justified nor harmless, and it excluded Dr. Miklos' testimony under Rule 37(c)(1).

We review a district court's Rule 37(c)(1) decision only for abuse of discretion. *Crawford*, 977 F.3d at 1341. When deciding whether the exclusion of a late-disclosed witness was an abuse of discretion, we "consider the explanation for the failure to disclose the witness, the importance of the testimony, and the prejudice to the opposing party." *Fabrica Italiana Lavorazione Materie Organiche, S.A.S v. Kaiser Aluminum & Chem. Corp.*, 684 F.2d 776, 780 (11th Cir. 1982).

Applying those factors, we conclude that the district court did not abuse its discretion by excluding Dr. Miklos' testimony. The record supports the district court's findings that Arevalo didn't have a good reason for the late disclosure and that the disclosure prejudiced Coloplast. Arevalo explains that she didn't disclose Dr. Miklos sooner because he wasn't sure whether she had all her mesh removed, and he wanted to obtain her medical records before suggesting treatment. But as the district court pointed out, Dr. Miklos received Arevalo's medical records within days after her appointment with him. He had all the information he needed to form his opinion in July 2020. Though Dr. Miklos may have needed time to review the records, Arevalo could have immediately given notice that he would be providing an expert opinion (even if he could not yet make his final treatment recommendation). At the least, she was aware of his causation opinion as early as July 2020 and should have asked at that point for the disclosure deadline to be reopened.

As for the prejudice to Coloplast, Arevalo waited until after the close of discovery to disclose Dr. Miklos' opinions, which

deprived Coloplast of an opportunity to depose the doctor or prepare rebuttal evidence. The district court considered reopening discovery but decided not to do so because it would have increased litigation costs and delayed any trial. Coloplast may have needed additional discovery for rebuttal, it would have likely filed another *Daubert* motion, and its summary judgment motion would have needed to be re-briefed.

The district court recognized that Dr. Miklos' testimony was "clearly important" to Arevalo's case. But we have held that the first and third factors together can outweigh the second. *Romero v. Drummond Co.*, 552 F.3d 1303, 1321 (11th Cir. 2008); *see also Bearint ex rel. Bearint v. Dorell Juv. Grp., Inc.*, 389 F.3d 1339, 1353 (11th Cir. 2004) ("Regardless of the importance of [the] testimony, the reasons for the delay in the . . . disclosure and the consequent prejudice that [the] testimony would have caused [the nonmoving party] require us to affirm the district court's ruling.").

Our review of a district court's Rule 37 sanctions decision is limited and deferential. "[W]e will not reverse the imposition of sanctions under Rule 37 unless we are left with a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of relevant factors." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1313 (11th Cir. 2011) (quotation marks omitted); *see also OFS Fitel, LLC v. Epstein, Becker & Green, P.C.*, 549 F.3d 1344, 1360 (11th Cir. 2008) ("Our review of a district court's decision to impose sanctions under Rule 37 is sharply limited to a search for an abuse

of discretion and a determination that the findings of the trial court are fully supported by the record") (quotation marks omitted). We conclude that the district court acted within its considerable discretion when it struck Arevalo's untimely disclosure of Dr. Miklos and prohibited her from using his expert opinion testimony. *See, e.g.*, *Guevara v. NCL (Bah.) Ltd.*, 920 F.3d 710, 718–19 (11th Cir. 2019) (concluding that the district court did not abuse its "broad discretion" in striking a supplemental expert report where the plaintiff unreasonably delayed in filing it until after the close of discovery and after the defendant had filed its motion for summary judgment and *Daubert* motions, and the plaintiff had done so without seeking leave of court or moving to extend discovery).[12]

---

[12] Arevalo alternatively contends that the court abused its discretion by refusing to impose a lesser sanction. She argues that because the grant of Coloplast's motion to strike Dr. Miklos' disclosure led to its summary judgment victory, the exclusion of Dr. Miklos' testimony ultimately "amounted to a dismissal." According to Arevalo, to exclude the evidence entirely the district court was required to find bad faith or willfulness.

We have not decided whether an untimely disclosure, even one that is not substantially justified or harmless, always requires exclusion of the evidence. *Crawford*, 977 F.3d at 1342 n.4. But we cannot say that the district court abused its discretion by excluding Dr. Miklos' testimony in its entirety. First, "[o]ur caselaw is clear that only in a case where the court imposes the most severe [Rule 37] sanction — default or dismissal — is a finding of willfulness or bad faith failure to comply necessary." *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 12 F.3d 1045, 1049 (11th Cir. 1994). The court did not impose either of those Rule 37 sanctions. Instead, it excluded the testimony of the witness. Second, the court did consider other options short of precluding Arevalo from using Dr. Miklos' testimony but found that exclusion of the

### C.  Summary Judgment

Finally, we consider Arevalo's challenge to the grant of summary judgment in favor of Coloplast on her strict liability and negligence claims.  Our review is *de novo*.  *See Chapman*, 766 F.3d at 1312.  Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When a party fails to proffer sufficient evidence to establish an element on which she will bear the burden of proof at trial, there is no genuine dispute of material fact.  *Chapman*, 766 F.3d at 1312.

To prove causation under Florida law, which applies to Arevalo's strict liability and negligence claims, the plaintiff must introduce evidence that "it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result."  *Guinn*, 602 F.3d at 1256 (quoting *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984)).  To avoid summary judgment in this products liability case, Arevalo must have "*Daubert*-qualified, general and specific-causation-expert testimony that would be admissible at trial."  *Chapman*, 766 F.3d at 1316.  Dr. Rosenzweig's and Dr. Miklos' specific causation opinions are inadmissible.  But Arevalo argues that Dr. Kahn's opinions are enough

---

testimony was the appropriate remedy under the circumstances.  It explained that "[a]ny lesser sanction would frustrate the purpose and intent of Rule 26 and the discovery process and frustrate the orderly (and long-overdue) disposition of this case."  We are not persuaded that this was a clear error of judgment.  *Josendis*, 662 F.3d at 1313.

to create a factual dispute about specific causation sufficient to withstand summary judgment. We disagree.

Dr. Kahn testified that when she gave Arevalo a physical exam and touched Exair mesh in the front vaginal wall, Arevalo felt tenderness and pain (distinct from the pain at the site of her hysterectomy scar). Dr. Kahn described the band of mesh as tight and unpliable and thought that removing it would relieve the pain and tenderness. She testified that after removing "a good portion" of the front mesh, she felt an "appreciable decrease in the band" — meaning that it had "loosen[ed]" — which gave her hope that Arevalo's pain would improve. And during Arevalo's final post-op exam, Dr. Kahn's notes don't reflect that Arevalo complained of any tenderness.

But when it came to offering a causation opinion, Dr. Kahn's testimony was speculative and equivocal. When asked whether the "pain that [Arevalo] had been experiencing before [the mesh removal] was caused or contributed to have been caused by the mesh," Dr. Kahn answered, "It's possible, but she didn't come back, so I don't know." She opined that the pain and tenderness at the site of the front mesh implant were "more likely than not . . . related to the graft," but she didn't know whether the mesh removal procedure was successful in relieving the tenderness that Arevalo had reported. She explained that the "real test" of the removal surgery's success would be if Arevalo no longer had pain during intercourse. And Arevalo testified that after the surgery she has continued to have that pain. Dr. Kahn also ruled out the mesh

as a cause of Arevalo's mixed urge and stress incontinence, urinary urgency and frequency, fecal smearing, fecal incontinence, myalgia, and hysterectomy scar pain.

Dr. Kahn's testimony is not enough to create a genuine issue about whether the mesh implants were substantial factors in causing Arevalo's injuries.[13]  Because Arevalo lacks sufficient admissible expert testimony on specific causation, Coloplast is entitled to summary judgment.  See Rink v. Cheminova, Inc., 400 F.3d 1286, 1295–96 (11th Cir. 2005) (affirming summary judgment based on exclusion of expert testimony on causation).

## IV. CONCLUSION

The district court did not abuse its discretion by excluding Dr. Rosenzweig's specific causation opinion and Dr. Miklos' expert testimony.  Nor did it err in granting summary judgment in favor of Coloplast.

The final judgment of the district court is **AFFIRMED**.

---

[13] There are lingering questions about whether Dr. Kahn's specific causation opinion was properly disclosed under Rule 26(a)(2)(C) and whether it could survive Daubert scrutiny.  The district court left these questions unanswered. Because we do not believe that Dr. Kahn's testimony creates a factual dispute about specific causation in any event, we need not remand for the district court to consider these issues.